FILED
2013 Jan-04  AM 09:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| VINCENT BROWN | ] | |
| | ] | |
|     **Plaintiff,** | ] | |
| | ] | |
| v. | ] | |
| | ] | 2:11-CV-4281-KOB |
| PSC INDUSTRIAL OUTSOURCING, LP, | ] | |
| | ] | |
|     **Defendant.** | ] | |

## MEMORANDUM OPINION

This case comes before the court on Defendant PSC Industrial Outsourcing LP's Motion for Summary Judgment (doc. 26) and Motion to Strike the Affidavit of Plaintiff Vincent Brown (doc. 36). The facts that led to this race discrimination and retaliation case happened over the course of two weeks at a U.S. Steel Facility in Fairfield, Alabama. Mr. Brown claims PSC, an embedded contractor at U.S. Steel, discriminated against him on the basis of his race and retaliated against him because he complained to a supervisor about being treated unfairly because of his race. Taking every reasonable inference in Mr. Brown's favor and resolving all disputes of fact in Mr. Brown's favor, the court finds that Mr. Brown cannot rebut PSC's legitimate reason for his termination and that PSC is entitled to judgment as matter of law. The court will simultaneously enter an order to that effect.

I.     MOTION TO STRIKE

On November 15, 2012, PSC filed a "Motion to Strike the Affidavit of Plaintiff Vincent Brown," arguing that the court should strike Mr. Brown's affidavit as a sham. (Doc. 36). Mr.

1

Brown did not respond to PSC's motion. The court will consider this motion first because it determines what evidence is properly before the court when considering the motion for summary judgment.

The Eleventh Circuit has held that a district court can disregard affidavits submitted in support of a brief opposing summary judgment when "that affidavit is directly contradicted by deposition testimony." *See McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1240 n. 7 (2003). The court explained that "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony. Such an affidavit would be a sham." *Id.* at 1240, n. 7(citations omitted).

However, "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early [sic] deposition.*" Green v. Pittsburgh Plate & Glass Co.*, 224 F. Supp. 2d 1348, 1362 (N.D. Ala. 2002) (citations omitted). Therefore, the court must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007)(quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir.1986)).

PSC points to several inconsistencies between Mr. Brown's deposition testimony and the statements made in his affidavit. PSC, however, fails to account for the inconsistencies within Mr. Brown's deposition itself. For instance, PSC argues that Mr. Brown's statement in his

affidavit that he complained to Mr. Puckett about race discrimination (doc. 33-6, at ¶ 6) is inconsistent with his deposition testimony that he did not speak to Mr. Puckett about race discrimination at all (doc. 28-11, at 232). PSC is correct in that this statement creates a blatant inconsistency between Mr. Brown's testimony and his sworn affidavit. However, Mr. Brown also testified during his deposition that he *did* complaint to Mr. Puckett about what he perceived as race discrimination when he testified that he "let [Mr. Puckett] know that I felt like it was racist; because if I, me, a black man, had of [sic] hit that white man with the shovel, they would have fired me." (Doc. 28-11, at 258).

While inherent inconsistencies exist between the affidavit and Mr. Brown's deposition testimony, the court will not reject the whole affidavit as a sham when such inconsistencies also exist within Mr. Brown's deposition testimony. Because the deposition taken alone or the deposition and affidavit taken together reflect the inconsistencies in Mr. Brown's testimony and create issues of fact, the court does not need to strike the affidavit. Regardless of whether the affidavit is part of the record, the court finds that genuine issues of material fact exist about whether Mr. Brown complained about racial discrimination at PSC and thus engaged in Title VII protected activity. Accordingly, the court will DENY PSC's motion to strike, and the court will consider Mr. Brown's affidavit in ruling on this motion.

III.   MOTION FOR SUMMARY JUDGMENT

A.   Factual History

Defendant PSC provides industrial support services such as high-pressure washing, hydroblasting, and industrial contracting. One of PSC's customers is U.S. Steel Corporation, and PSC operates as an embedded contractor at the U.S. Steel facility in Fairfield, Alabama. PSC

hired Mr. Brown as an Air Moving Technician on September 16, 2010 and then terminated him

on October 8, 2010, when his job was eliminated. PSC then rehired Mr. Brown as an Air Moving

Technician on November 29, 2010. Technicians are responsible for assisting operators who run

the equipment and performing physical labor.

Two different supervisors testified that Mr. Brown's co-workers complained to them

about Mr. Brown's work performance during his second period of employment at PSC. Sonny

Patterson, the PSC location manager for operations at Fairfield and PSC's highest ranking

supervisor at the Fairfield location, testified that Mr. Brown's co-workers "come [sic]

complaining to me about him not pulling his weight" and told Mr. Patterson that they "would

rather not work with him because he don't [sic] want to do nothing." (Doc. 28-4, at 126-27).

David Puckett, the PSC site supervisor for Fairfield, testified that "multiple people . . . did not

want to work with [Mr. Brown]." (Doc. 28-7, at 48). Both Mr. Patterson and Mr. Puckett testified

that they verbally coached and counseled Mr. Brown about his performance, but they did not

memorialize these conversations in writing. (Doc. 28-4, at 126-27; Doc. 28-7, at 48). Mr. Brown

testified that, to his knowledge, no one had ever verbally complained about his work performance

at PSC and that none of his supervisors had ever counseled or talked to him about work

performance issues. (Doc. 28-11, at 192-93).

The PSC Employee Handbook contains a "Disciplinary Procedures" section that

recommends supervisors follow-up on verbal counseling with a written memo, but it does not

require supervisors to do so. (Doc. 28-3, at 17). The Handbook also provides for discipline in the

form of Written Reprimands, Disciplinary Demotions, Suspensions, and Immediate Discharge.

*Id.* The Handbook specifically states that "[r]epeated violations and performance problems will

4

normally result in increasingly serious disciplinary actions, up to and including termination, although some steps may be skipped all together as appropriate." *Id.*

While employed by PSC, Mr. Brown heard Caucasian and African American PSC employees making racial jokes toward each other "which [he] did not find funny." (Doc. 28-11, at 124). He also recalls hearing Caucasian employees calling African American employees, "the N-word," and African American employees calling Caucasians, "cracker." (Doc. 29-11, at 197). Mr. Brown found the jokes "offensive," however, he never reported any of these jokes or inappropriate language to his supervisors or anyone at PSC. *Id.* at 129. Mr. Patterson also testified that he had heard employees using "racially derogatory terms," but that no employee had complained about that behavior nor had he ever reprimanded anyone in writing because of it. (Doc. 28-7, at 152-53). Mr. Patterson did testify that he "verbally told guys they don't need to be using that, you know, terminology." *Id.*

On March 1, 2011, James Ford, a PSC employee,  was cleaning the inside of a large tank with a shovel as the other crew members, including Mr. Brown, stood outside of the tank. Mr. Ford became angry and threw the shovel, hitting Mr. Brown on the arm. Mr. Brown testified that Mr. Ford did not look before throwing the shovel and did not know that the shovel hit Mr. Brown. (Doc. 28-11, at 149-50). Mr. Brown also testified that the shovel bruised his arm. *Id.*

The crew operator who was present spoke to Ford about hitting Mr. Brown at Mr. Brown's request, but Mr. Brown does not know exactly what was said. *Id.* at 150.  Mr. Brown complained to the crew operator and asked him to call a supervisor because Mr. Brown thought Mr. Ford was being rude by not saying "Excuse me." *Id.*  The crew operator called Mr. Puckett, and Mr. Puckett sent another PSC supervisor named Charles to talk to Mr. Brown.  Mr. Brown

5

testified that Charles said "Well, it ain't killed you . . . Don't worry about it." *Id.* at 152.

Mr. Brown testified that he also complained about the shovel incident to Mr. Puckett. (Doc. 28-11, at 115). Mr. Brown testified that he "let [Mr. Puckett] know that I felt like it was racist; because if I, me, a black man, had of [sic] hit that white man with the shovel, they would have fired me." (Doc. 28-11, at 258).[1] Mr. Puckett testified that he does not particularly remember having talked to Mr. Brown about the incident and did not take part in any investigation of the incident. (Doc. 28-7, at 51-53).

PSC's Employee Handbook provides complaint resolution guidelines. (Doc. 28-3, at 87). The procedure for an employee to report a complaint or problem is to first discuss the issue with his immediate supervisor, and then, if not satisfied, request review by his supervisor's immediate manager. If the employee is reluctant to discuss the issue with his supervisor, then the employee can take his complaint to a human resources representative, the Vice President of Human Resources and Administration, or PSC's General Counsel. From there, PSC conducts an internal investigation and takes corrective action, when necessary. In addition to or instead of following this procedure, an employee can call the Ethics Hotline to lodge a complaint. While employed by PSC, Mr. Brown read and understood the Employee Handbook, including the complaint procedures and PSC's harassment and discrimination policy. (Doc. 28-11, at 109-11).

On March 8, 2011, U.S. Steel had a major outage; during an outage, U.S. Steel shuts

---

[1]     Mr. Brown's deposition testimony is replete with inconsistencies, including an admission that he never spoke to Mr. Puckett about race regarding the shovel incident or after the shovel incident. (Doc. 28-11, at 232). The court, however, at the summary judgment stage must view the facts in the light most favorable to the plaintiff. For the sake of this opinion, the court must assume that this conversation did in fact take place and Mr. Brown did in fact complain about being treated unfairly because of his race.

down production to allow its embedded contractors, like PSC, to perform repair and maintenance work. During this outage, Mr. Patterson's workforce in Fairfield grew from twenty-three to one hundred and twenty-three employees. Mr. Patterson is rarely in the office during an outage due to time constraints and the amount of work that must be performed.

On March 8, 2011, Mr. Brown and four co-workers, Donny Knighten, Jimmy Brown, Jemal Moore, and Jack Nix, were working on the blast furnace.  The crew was removing iron pellets and coke filings from around a conveyor belt by shoveling material into buckets and carrying the buckets down the conveyor belt to dump out. Mr. Brown testified that he had to carry the full five-gallon buckets for about as far as a football field is long.  (Doc. 28-11, at 158). Mr. Brown testified that the first time he carried material he was carrying two buckets but after that, he carried only one bucket. (Doc. 28-11, at 159-60). Mr. Patterson testified that Mr. Brown's co-workers were upset with Mr. Brown for only carrying one bucket and "not pulling his weight." (Doc. 28-4, at 106-108).

Mr. Brown testified that after Mr. Knighten made one trip with the buckets, he went to get some water. When he came back, everyone on the crew was laughing at him, including Mr. Brown. (Doc. 28-11, at 160-61). Mr. Brown testified that Mr. Knighten got mad about him laughing and made threats to Mr. Brown like, "When you get off work, I'll get you then!" *Id.* at 161.

 Mr. Patterson testified that Mr. Knighten told Mr. Brown that he needed to pull his weight because the job needed to be finished in a certain amount of time.  (Doc. 28-4, at 108). Mr. Puckett testified that then Mr. Brown "got up in [Mr. Knighton's] face." *Id.*  Regardless of how the altercation started or who the initial aggressor was, Mr. Brown and Mr. Knighton

exchanged threats and cursed at each other. Mr. Brown testified that Mr. Knighton pushed him

out of the way when Mr. Brown followed him to the elevator, but Mr. Puckett testified that Mr.

Brown and Mr. Knighton did not engage in any physical violence. (Doc. 28-11, at 164; Doc. 28-

4, at 107).

Following the incident, Mr. Brown left the blast furnace and went to the PSC office. Mr.

Patterson first heard about the incident at about 4:30 p.m. that afternoon and contacted Mr.

Puckett to see if Mr. Brown was in the office. Mr. Patterson told Mr. Puckett to keep Mr. Brown

in the office so he could speak with him about the incident. Mr. Brown spoke with Mr. Puckett

about the incident, and Mr. Puckett testified that Mr. Brown told him Mr. Knighton threatened

him. (Doc. 28-7, at 56). Mr. Puckett testified that he did not investigate the incident because he

thought Mr. Patterson would investigate an incident that occurred at the blast furnace, which was

under Mr. Patterson's supervision. *Id.* During one of his March 8th conversations with Mr.

Puckett, Mr. Brown testified that Mr. Puckett told him he should not have come to him with his

complaint  but instead "should have told the blast furnace guys," which Mr. Brown interpreted to

mean the U.S. Steel supervisors. (Doc. 28-11, at 172).

Mr. Patterson had a 5:00 p.m. meeting with U.S. Steel management and outage

coordinators. Mr. Patterson spoke briefly to Mr. Brown before he went to the meeting, and Mr.

Brown told Mr. Patterson that Mr. Knighton threatened him. (Doc. 28-14, at 20). Mr. Brown did

not tell Mr. Patterson that Mr. Knighton pushed him nor did Mr. Brown mention anything about

race. *Id.* Mr. Patterson finished his meeting at 6:00 p.m. and then had to attend to issues that

"needed to be addressed immediately after the meeting." (Doc. 28-4, at 101). While Mr.

Patterson was at the blast furnace handling other business, he talked to Mr. Brown's co-workers

about the incident. *Id.* at 105.

Mr. Patterson testified that Jemal Moore and Jimmy Brown both told him that Mr. Brown was the aggressor in the incident and that Mr. Brown was upset because Mr. Knighton made a comment to Mr. Brown about not "pulling his weight." *Id.* at 105-108. After Mr. Patterson spoke with the crew members, he instructed Mr. Puckett to send Mr. Brown home because it was close to the end of his scheduled shift. Mr. Patterson planned to speak to Mr. Brown the following day, March 9, 2011. *Id.* at 109. Mr. Patterson testified that he was not going to discipline Mr. Brown or Mr. Knighton for the March 8th incident because he learned through his investigation that they were both in each other's faces.

Mr. Patterson did not have a chance to speak to Mr. Brown at the beginning of his shift on March 9th, but Mr. Patterson did speak with Mr. Puckett about his conversation with Mr. Brown the previous day. Mr. Brown went to work and PSC assigned him to a different crew to try to avoid any further problems between Mr. Brown and his coworkers. Mr. Patterson testified that sometime during the day on March 9th, a U.S. Steel employee called him to tell him that a PSC employee "was in [the U.S. Steel] office complaining about a PSC personnel issue" and "needed to be removed from their office because it was not a situation that they needed to handle." (Doc. 28-4, at 90-91; 114). Mr. Patterson testified that he told Mr. Puckett to go get Mr. Brown, send him home, and tell him to call Mr. Patterson in a couple of days. *Id.* at 114.

Mr. Brown testified that Mr. Puckett "said I should have told U.S. Steel" about the incident. (Doc. 28-11, at 118, 183-84). Mr. Brown testified that around 10:00 a.m. on March 9th, a U.S. Steel supervisor walked by where he was working and Mr. Brown asked him, "[W]hat would I do if I was having a problem with someone that, you know – I was kind of like, I guess

9

you would say scared of them." *Id.* at 186. Mr. Brown then testified that the U.S. Steel supervisor told him "Well you need to let us–that's what you do, let us know. . . Well, I'll talk to [Mr. Puckett] and them, and we'll go from there." *Id.* Mr. Brown testified that a PSC supervisor then picked him up in a truck and took him to the PSC trailer. *Id.* Mr. Brown testified that he waited in the trailer until Bill Neeley, a safety employee, came to speak to him and took down a statement about what had happened and then he was sent home. *Id.* at 189-90.

Mr. Brown testified that at sometime on March 8th or 9th,  he complained to both Mr. Puckett and Mr. Patterson "because [he] felt like [he] was being treated differently." (Doc. 28-11, at 168).  Mr. Brown also testified that he told Mr. Puckett that he was "a 45-year-old black man, and I don't bother nobody at this job." (Doc. 28-11, at 173). Mr. Brown testified that sometime between March 1st and 8th, 2010, he told "them," which the court assumes to be Mr. Patterson, Mr. Puckett, or another PSC supervisor that he "did not like the way [he] was being treated, but [he] was being treated that way because [he] was black man." (Doc. 28-11, at 223, 231).

The parties do not dispute that Mr. Brown did not mention anything about race to the U.S. Steel supervisor. To Mr. Brown's knowledge, no other PSC employee has ever complained to a U.S. Steel employee about a PSC personnel issue. Mr. Brown does not dispute that his complaining to U.S. Steel was inappropriate.  PSC does not have a specific rule prohibiting its employees from speaking to U.S. Steel employees, but Mr. Patterson testified that he thought PSC employees should not "be able to talk to customers [like U.S. Steel] about PSC issues." (Doc. 28-4, at 124-5).

A few days after the March 9th incident, Mr. Brown called Mr. Patterson. Mr. Brown testified that during that phone call, Mr. Patterson terminated Mr. Brown "because [he] did not

follow the procedure for when [he] ha[s] complaints inside the business." (Doc. 28-11, at 120). Mr. Patterson testified that Mr. Brown should have contacted PSC Human Resources if he believed PSC supervisors were not doing anything about his complaint. (Doc. 28-4, at 117).  Mr. Patterson also testified that he alone made the decision to terminate Mr. Brown and did not discuss it with anyone. *Id.* at 120.

 PSC sent Mr. Brown a letter dated March 21, 2011 notifying him of his termination because of "Poor Performance." (Doc. 33-8, at 2). Mr. Patterson testified that Mr. Brown was terminated for "his poor work performance in combination of his regards to violate policy and go above and beyond PSC to complain about personnel issues to a customer." (Doc. 28-4, at 88). Mr. Patterson also testified that Mr. Brown's conduct was "detrimental to [PSC's] business" because "he violated a conduct rule by going to a customer and complaining." *Id.* at 89. PSC previously terminated a white employee for complaining to a customer about a PSC personnel issue.

Mr. Patterson prepared a Personnel Action Notice ("PAN") form after Mr. Brown's termination and listed "Violation of Rules" as the reason for termination. ("Personnel Action Notice" Doc. 28-2, at 2).  Mr. Patterson sent the form to Rocky Ransonet, Regional General Manager, who passed it on to Human Resources. Human Resources Coordinator Tracy Galinta emailed the PAN form and Mr. Brown's termination letter to Chad Haddock, Human Resources Director in the Industrial Services Division, for approval. Mr. Patterson testified that he told Mr. Haddock that he terminated Mr. Brown "because he had went [sic] to the U.S. Steel customer complaining about a personnel issue." (Doc. 28-4, at 132). Mr. Patterson also told Mr. Haddock about Mr. Brown "having prior work performance issues." *Id.* Mr. Haddock approved the PAN

form and instructed Ms. Galinta to sign the form with his name, which is common procedure. (Doc. 28-9, at 45-47).

### B.   Procedural History

Mr. Brown filed an EEOC charge of discrimination on March 14, 2011. The charge claimed race discrimination and retaliation. (Doc. 28-14, at 25). Mr. Brown specifically referred to the March 1, 2010 incident when Mr. Ford hit him with a shovel, but did not include the March 8th incident with Mr. Knighton or his complaint to a U.S. Steel supervisor.

After Mr. Haddock received the charge, he contacted Mr. Patterson. Mr. Patterson told Mr. Haddock that he terminated Mr. Brown because he had complained to a customer and because he was underperforming. (Doc. 28-9, at 56). Mr. Haddock responded to the EEOC charge by listing "unsatisfactory performance" as the reason for Mr. Brown's termination. (Doc. 28-9, at 38).  Mr. Haddock testified that Mr. Brown's actions and performance problems amounted to what he considered "[u]nsatisfactory performance." (Doc. 28-9, at 81-2). Mr. Haddock did not include the incident Mr. Brown had with Mr. Knighton in his response to the EEOC charge because "it was not part of the EEOC charge." *Id.* at 84.

### C.   Standard of Review

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a

genuine need for trial."). The moving party need not present evidence in a form admissible at trial; "however, he may not merely rest on [the] pleadings." *Celotex*, 477 U.S. at 324. If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The nonmoving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

D.   Legal Analysis

1.   Prima Facie Case of Discrimination

Mr. Brown alleges that PSC engaged in unlawful race discrimination under Title VII of

14

the Civil Rights Act of 1984 and 42 U.S.C. § 1981 in count I of his Complaint. Because both statutes rely on the same prima facie case to show discrimination, the court will consider them together. *See Bryant v. Jones,* 575 F.3d 1281, 1286 n. 20 (11th Cir. 2009) ("[D]iscrimination claims . . . brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, are subject to the same standards of proof and employ the same analytical framework.").

One way to establish a claim of racial discrimination is through direct evidence. *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997). If the plaintiff cannot prove discrimination by direct evidence, as in this case, the plaintiff must establish his prima facie case through the burden shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Nevertheless, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated . . . remains with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 251-52 (1981).

Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." 411 U.S. at 802. A plaintiff can establish a prima facie case of racial discrimination based on disparate treatment by showing that (1) he belongs to a racial minority, (2) he experienced an adverse job action, (3) his employer treated similarly situated employees outside his classification more favorably, and (4) he was qualified to do the job. *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003).

Mr. Brown is African American and thus satisfies the first element in proving a prima facie case of discrimination. He is also able to show that PSC took an adverse employment action

against him because PSC terminated his employment. See *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (stating that changes in employment status "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" constitute adverse employment actions).

Mr. Brown, however, cannot show that PSC treated similarly situated non-African American employees more favorably. "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Hollifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "Indeed, '[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.'" *Embry v. Callahan Eye Found. Hosp.*, 147 Fed. Appx. 819, 829, 2005 WL 2009046, at *8 (11th Cir. 2005) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)).

Mr. Brown attempts to put forward Mr. Knighten and Mr. Ford as valid comparators. However, Mr. Brown presents no evidence that shows either Mr. Ford or Mr. Knighten engaged in similar conduct as Mr. Brown.  Whether Mr. Brown was terminated for his poor performance, his complaint to a U.S. Steel supervisor, or a combination of the both, no evidence exists that Mr. Knighten or Mr. Ford engaged in that same kind of behavior and were not terminated by PSC. In fact, PSC had previously terminated a Caucasian employee for complaining to a customer, which is the same conduct for which PSC supervisors state they fired Mr. Brown. (Doc. 28-8, at 40-41).

Mr. Brown argues that Mr. Knighton and Mr. Ford engaged in the same kind of conduct as he did in that they violated PSC work rules. While Mr. Brown is correct that one piece of evidence shows he was terminated for "violation of a work rule," the rule that Mr. Brown

16

violated was going to a customer, U.S. Steel, and complaining about PSC personnel issues, and the rule that Mr. Knighton and Mr. Ford supposedly violated was related to "violence in the workplace." (Doc. 32, at 18).

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998) (quoting *Holifield*, 115 F.3d at 1562 (11th Cir.1997)). "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (citations and quotations omitted). Although Mr. Brown is correct that all three employees violated PSC work rules, they did not violate the same work rule, and thus Mr. Ford and Mr. Knighton cannot be valid comparators. Mr. Patterson testified that Mr. Brown's complaining to a customer was very detrimental to PSC's business relationship with its customer and also testified that he did not plan on disciplining Mr. Brown or Mr. Knighton for their altercation on May 23, 2010.  This key difference in the type of work rule violated and the caliber of detriment to PSC's business as a result of the different actions prevents Mr. Knighton and Mr. Ford from being valid comparators.

Mr. Brown has not produced evidence of any valid comparator, and in fact, PSC produced evidence that PSC previously terminated a Caucasian employee for complaining to a customer, which is the same conduct for which PSC supervisors state they fired Mr. Brown. (Doc. 28-8, at 40-41).  Mr. Brown is unable to make a prima facie showing of discrimination, and PSC is entitled to summary judgment on this claim.  Because the *McDonnell Douglass* burden shifting analysis applies to both Mr. Brown's discrimination and retaliation claims, the

17

court will consider whether he can show that PSC's proffered legitimate reasons for his termination are pretext for both of his claims together after analyzing Mr. Brown's prima facie showing of his claim for retaliation.

2.       Prima Facie Case of Retaliation

Mr. Brown charges PSC with retaliation under Title VII in count II of his Complaint. Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (1982). The court analyzes claims of retaliation for engaging in a protected activity, like those for discrimination, under the *McDonnell Douglas* burden-shifting framework. *Bernard v. SSA Security, Inc.*, 2008 WL 4823987, at *2 (11th Cir. 2008).  Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case" of retaliation. *McDonnell Douglas*, 411 U.S. at 802.

To establish a prima face case of retaliation under Title VII, "a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two events." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (internal quotation marks omitted).

To constitute "statutorily protected expression," a plaintiff need not establish an underlying discrimination claim; instead, the plaintiff must show that he had a "good faith, reasonable belief" that he was the victim of an unlawful employment practice. *Lipphardt v.*

18

*Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1187 (11th Cir. 2001).  As the Eleventh

Circuit has stated, "the protection afforded by the statute is not limited to individuals who have

filed formal complaints, but extends as well to those, like [the plaintiff], who informally voice

complaints to their superiors or who use their employers' internal grievance procedures." *Rollins*

*v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).

       In his deposition, Mr. Brown testified that he "let [Mr. Puckett] know that I felt like it

was racist; because if I, me, a black man, had of [sic] hit that white man with the shovel, they

would have fired me." (Doc. 28-11, at 258). Mr. Brown testified that he complained to a

supervisor about disparate treatment based on his race, and PSC has not put forth any evidence

that Mr. Brown did not believe in good faith he was being unfairly discriminated against. This

testimony alone is enough to satisfy the first element for a prima facie claim of discrimination,

and Mr. Brown's undisputed termination is sufficient to satisfy the adverse employment action

requirement.

       "The causal link element is construed broadly so that a plaintiff merely has to prove the

protected activity and the negative employment action are not completely unrelated." *Pennington*

*v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (internal quotation marks omitted).

Generally, "close temporal proximity between the employee's protected conduct and the adverse

employment action is sufficient circumstantial evidence to create a genuine issue of material fact

about a causal connection," but to satisfy this showing, a plaintiff must establish "that the

decision maker was aware of the protected conduct at the time of the adverse employment

action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir.2000).

       Mr. Brown's alleged complaint occurred sometime between March 1 and 9, 2010. Then,

19

PSC terminated his employment on March 13, 2010. This close temporal proximity satisfies the causal requirement to prove a prima facie case of retaliation.

However, because "[a] decision maker cannot have been motivated to retaliate by something unknown to him," Mr. Brown needs to put forth evidence that Mr. Patterson, the decision-maker, was aware of Mr. Brown's complaint of racial discrimination to Mr. Puckett at the time Mr. Patterson terminated Mr. Brown.  Mr. Patterson testified that he made the decision to terminate Mr. Brown unilaterally and did not discuss it with anyone. As Mr. Brown points out in his Response, however, Mr. Pcukett testified that he discussed Mr. Brown's complaints with Mr. Patterson. (Doc. Doc. 28-7, at 56-60). The exact contents of the complaints discussed is not clear, but Mr. Puckett's testimony is enough to raise a genuine issue of material fact about whether Mr. Patterson was aware of Mr. Brown's statutorily protected conduct when he terminated Mr. Brown. Thus, Mr. Brown has produced sufficient evidence to make a prima facie showing of retaliation.

3.     Legitimate Reason for Mr. Brown's Termination and Proof that it is Pretext

The court will consider Mr. Brown's claims of discrimination and retaliation together because PSC's legitimate reason for his termination and Mr. Brown's rebuttal are the same for both claims. Once the plaintiff establishes his prima facie case of discrimination or retaliation, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  *McDonnell Douglas*, 411 U.S. at 802.  Once the employer shows a legitimate, nondiscriminatory reason for its decision, the employee must "be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804.  To survive summary judgment, the employee must show "such

weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper*, 390 F.3d at 725.

PSC argues that Mr. Patterson decided to terminate Mr. Brown because of past performance issues and because Mr. Brown complained to a customer, U.S. Steel, about a PSC personnel issue. (Doc. 27, at 23). Mr. Brown argues that PSC's inconsistent reasons for terminating him show that PSC's given reasons are pretext. Mr. Brown is correct that PSC gave one reason for his termination in the PAC, "violation of rules" and another reason in his termination letter, "poor performance." (Doc. 28-2, at 2; Doc. 33-8, at 2). Mr. Brown, however, seems to confuse the notion of inconsistent reasons and cumulative reasons. Just because PSC cited "violation of rules" and "poor performance" both as reasons for Mr. Brown's termination, it does not mean that neither one of them was true and discrimination was the actual reason he was fired. Mr. Patterson and Mr. Haddock's testimony supports PSC's argument that Mr. Brown was terminated because of his continuing performance issues *and* his complaint to U.S. Steel. PSC's proffered reasons are not inherently inconsistent or contradictory; they are complementary and combined. Additionally, Mr. Brown presents no evidence rebutting these legitimate reasons other than his own belief about the reasons for his termination. Mr. Brown's unsupported opinion is not enough to rebut PSC's proffered reason for his termination.

"[A] reason cannot ... be a 'pretext for discrimination' unless it is shown both that the reason was false, *and that discrimination was the real reason.*" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)(emphasis added). "Because the plaintiff bears the burden of establishing pretext for discrimination, he must present significant probative evidence on the

issue to avoid summary judgment." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir.1996) (citation omitted). "Conclusory allegations or unsupported assertions of discrimination, without more, 'are not sufficient to raise an inference of pretext.'" *Tiggs-Vaughn v. Tuscaloosa Housing Auth.*, 385 F. App'x 919, 923 (11th Cir. 2010) (citing *Mayfield*, 101 F.3d at 1376)). "Rather, the plaintiff must meet the proffered reason 'head on and rebut it.'" *Id.* (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir.2000) (en banc )).

PSC argues that Mr. Patterson decided to terminate Mr. Brown based on "his performance issues and decision to circumvent the reporting procedures and take his personnel complaint to PSC's customer." (Doc. 27, at 32). Mr. Brown has not rebutted PSC's legitimate reasons for his termination. Instead, he testified that he knew it was improper for him to complain to U.S. Steel, a customer of PSC.  He also inherently recognized his own misconduct in the altercation with Mr. Knighton because both men exchanged threats, which Mr. Brown acknowledged was a violation of PSC's rules against violence in the workplace. (Doc. 32, at 18). Mr. Brown also has not produced and cannot cite to any evidence that discrimination against him on the basis of race or his protected activity was the *real reason* for his termination. Because Mr. Brown cannot make a prima facie showing of discrimination and cannot show that PSC's legitimate, non-discriminatory reasons were pretext for discrimination or retaliation, the court will GRANT summary judgment for PSC on both of Mr. Brown's claims.

IV.   CONCLUSION

For the foregoing reasons, the court will GRANT PSC's Motion for Summary Judgment on all counts and will DISMISS WITH PREJUDICE all of Mr. Brown's claims against PSC. The court will simultaneously enter an order to that effect.

DONE and ORDERED this 4th day of January, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE